**NAJRAN COMPANY FOR GENERAL CONTRACTING AND TRADING, Plaintiff,**

v.

**FLEETWOOD ENTERPRISES, INC., et al., Defendants.**

**No. CV485–12.**

United States District Court,
S.D. Georgia,
Savannah Division.

Oct. 1, 1986.

1083

John D. Sours, T. Bart Gary, Wasson, Sours & Harris, Atlanta, Ga., Robert G. Watt, Francis X. McCullough, Veinna, Va., for plaintiff.

Richard K. Hines, V, Atlanta, Ga., Richard Chernick, Steven Eugene Sletten, Los Angeles, Cal., for defendants.

## ORDER

EDENFIELD, District Judge.

Before the Court is a motion for partial summary judgment, filed by plaintiff Najran Company for General Contracting and Trading (Najran), a Saudi Arabian limited partnership. Najran seeks a ruling with respect to Counts I and II of its amended complaint, which was filed in this Court in April 1985 against defendants Fleetwood Enterprises, Inc. (FE), a Delaware corporation; Fleetwood Homes Georgia, Inc. (FMG), a Georgia corporation; Fleetwood Homes Florida, Inc. (FMF), a Florida corporation; and Fleetwood Homes North Carolina, Inc. (FHNC), a North Carolina corporation. The latter three organizations are wholly owned manufacturing subsidiaries of FE; they produced certain allegedly defective mobile homes, which

were sold to plaintiff through another FE subsidiary. Also before the Court is the defendants' motion to dismiss those claims in plaintiff's amended complaint that are brought under the Magnuson-Moss Warranty Act.

Najran requests that this Court resolve issues it deems to be of crucial importance with respect to certain arbitration proceedings now being conducted in California before a panel of the International Chamber of Commerce (ICC). Those proceeding were commenced by Najran in December, 1983 against Fleetwood International, Inc. (FI), the FE subsidiary with which Najran had contracted for the purchase of 600 Fleetwood mobile homes. FI is a California corporation. Another FE subsidiary, GSF Installation, Inc. (GSF), is now a party to the California arbitration, as well. In essence, plaintiff requests that this Court rule defendant FE to be the alter ego of its various subsidiaries, thus rendering FE and the subsidiary defendants in the action before this Court jointly and severally liable for any award that may be assessed in Najran's favor in the California arbitration. Alternatively, plaintiff seeks a ruling that FE guaranteed the performance of its subsidiaries, FI and GSF, with respect to the transactions at issue in the arbitration proceedings. Finally, plaintiff asserts that it is entitled to attorney's fees under Georgia law.

Defendants' motion to dismiss plaintiff's Magnuson-Moss claims is based, *inter alia*, on the ground that the Act does not provide protection to a volume commercial purchaser of mobile homes. Defendants also contend that plaintiff purchased the homes for purposes of resale, thereby precluding recovery under the Act. Finally, defendants maintain that, even if plaintiff did not purchase the homes with the intention of selling them, several other factors militate in favor of dismissing these claims.

For the reasons given below, the plaintiff's motion for summary judgment is granted in part and denied in part, and defendants' motion to dismiss is denied.

## I. *Background*

As one of the parties to this action has noted, the facts of this case are indeed "serpentine." Because this Order represents, in substantial part, a summary judgment, there is no requirement that the Court make findings of fact. However, because "[i]n many cases findings are extremely helpful to a reviewing court," *Anderson v. Liberty Lobby,* —— U.S. ——, —— n. 6, 106 S.Ct. 2505, 2511 n. 6, 91 L.Ed.2d 202, 213 n. 6, and because a familiarity with the facts of the case is essential to an understanding of this Court's legal determinations, the facts must be examined in some detail.

### A. *Negotiations*

In early 1982, Najran entered into leasing, construction, and maintenance contracts with the Kingdom of Saudia Arabia Royal Commission for Jubail and Yanbu, and with Saudi Basic Industries Corporation (SABIC). Among other obligations under these contracts, Najran was to supply 600 "double wide" mobile homes to serve as living quarters for employees of companies affiliated with SABIC, and for these employees' families, in a large industrial complex in Jubail, Saudi Arabia. In March, 1982, Najran approached United Gulf Services (UGS), an export company that had previously arranged for the sale and transport of Fleetwood mobile homes to Saudi Arabia, inquiring about the ability of UGS to supply the 600 homes needed by Najran.

In April 1982, representatives of both UGS and *FE* responded to Najran's inquiries concerning the possible purchase of mobile homes. [Exhs. 13B & 13C]. The responses submitted to Najran indicated the contractual terms, including the price, that would apply with respect a sale to Najran of 600 such homes meeting certain buyer specifications. Najran was interested in pursuing the matter further. Accordingly, a meeting between representatives of Najran, UGS and FE took place on May 18 at the corporate headquarters of FE in Riverside, California. At this meeting the parties discussed various aspects of the contemplated project and specifications for

the mobile homes. Mr. Potter, an officer of FE, explained to the Najran representatives that FE itself generally does not enter into contracts involving international sales, but instead sells its homes at the port of export to a third party such as UGS who in turn exports the homes and handles all shipping and transport logistics. [Habib Dep. 161–62].

On the following day, at a meeting held for purposes of discussing the possible execution of a contract between Najran and UGS, a Najran representative requested that UGS obtain assurances from FE and the carrier (SALEN) that the latter would bear financial responsibility for their respective portions of any such transaction. [Habib decl. at ¶ 56; Defendant's Memo in Opposition p. 44].

On May 21, a UGS representative prepared a letter of intent for review and signature by a Najran representative. The addressee of this letter was designated by the UGS representative as FE. The letter granted FE the right "to designate which of [its] corporate entities, including United Gulf Services, Inc., [was] to be the contracting party for this project as well as the beneficiary of the ... Letter of Credit...." As signed, the letter of intent conditioned the terms just mentioned on Najran's receipt of "satisfactory evidence of financial responsibility, and/or a financial guarantee of such entity...." [Exh. 31]. The UGS representative has stated that he cannot recall why the letter of intent was to be directed to FE, or why certain wording was included in the letter. He has admitted to poor draftsmanship, insofar as the document implies that UGS is a subsidiary of FE. [Habib Dep. at 151–60]. UGS is not a subsidiary of FE.

FE was asked to and did provide assurances to Najran, in a letter from FE representative Nelson W. Potter dated May 26, 1982, to the effect, *inter alia*, that FE would "assume full financial and legal responsibility for the mobile homes which we will manufacture and which will be covered in your contract with United Gulf Services." Included in Potter's letter were also assurances with respect to the quality and specifications of the homes to be constructed, and with respect to FE's assumption of financial responsibility for the inland transportation of the mobile homes and for any delays in such transportation. A copy of FE's then most recent annual report, and its three then most recent quarterly reports also were forwarded to Najran "[s]o that [Najran would] be certain of [FE's] ability to bear any such financial responsibility...." [Exh. 32]. As will be discussed, *infra*, the contract ultimately executed by Najran was with FE's subsidiary, FI, and not with UGS. Thus, a hotly contested issue between the parties is whether the above-mentioned assurances were intended to apply to whatever contract Najran might execute for the purchase of the 600 Fleetwood mobile homes, or these assurances were issued only to persuade Najran to contract with UGS.

On June 2, Mr. Potter of FE prepared a draft outlining certain consulting services that FE would provide with respect to the installation and supervision of the project in Saudi Arabia. The consulting services, as described in FE's June 2 draft were then incorporated into a June 3 draft of a purchase agreement to be executed by UGS and Najran. The terms of this draft indicated that *UGS* would provide consulting services. Mr. Potter, by deposition, has represented that in fact FE planned to provide the services/employees to UGS, which would then directly supply services to Najran. [Exhs. 551 & 4A].

Because of Najran's concern over UGS's small size and limited financial resources, further assurances were given to Najran in June and July by UGS, with respect to FE's assumption of responsibility for UGS's performance. [Exhs. A & 69]. The Riyadh Bank in Saudi Arabia, however, which was to lend Najran the money to purchase the Fleetwood homes through certain letters of credit (LCs), was also concerned about the financial standing of UGS, and made inquiries through Security Pacific National Bank (SP), its corresponding bank in California. A representative of SP spoke with Mr. Potter by telephone, on the basis of which the SP representative telexed certain information to the Riyadh

bank on July 7. The telex stated, among other things, that "Fleetwood confirms that they are committed to the transaction ... and they will delivery 600 mobile homes on the terms discussed with United Gulf Services and yourselves...." Mr. Potter received a copy of this telex on or about the same date and, while believing it to be incorrect in part, did not contact SP to inform it that it had made allegedly incorrect statements in its telex to the Riyadh Bank. [Potter Dep. 338–45; Exh. 141].

On July 14, the Riyadh Bank made further inquiries with respect to the financial standing of FE. SP contacted Mr. Potter, who supplied the bank with the names of FE's auditors and attorneys, as well as the names of all banks with which it had relationships. Potter also made it known to the SP representative that FE is a company listed on the New York Stock Exchange. [Potter Dep. 449–50]. On the same day, UGS telexed the Riyadh bank, supplying it with information about the status of FE similar to the information supplied that day by FE to SP. [Plaintiff's Reply to Defendants' Memo in Opposition at ¶ 24].

Due to the concerns raised by Najran and the Riyadh Bank in connection with the financial standing of UGS, it became clear to the parties by August 1982 that unless FE were to become the contracting party, neither Najran nor the Riyadh Bank would be willing to go through with the transaction. [Potter Dep. 462–68]. Thus, on August 12, 1982, two of FE's attorneys revised the draft purchase agreement with Najran to include for the first time a Fleetwood company as a contracting party. The company inserted in the contract, however, was not FE, but rather was FI, a wholly owned FE subsidiary. [Exh. 7].

The decision to use FI as the contracting party was made by members of FE's executive staff, and Mr. Potter has stated that the decision to name FI rather than FE as the contracting party seemed logical in that he and his "group" considered themselves "an international department of the corporation and that the transaction was significantly unique so it should have been and was isolated from our everyday business transactions." [Potter Dep. at 471]. Mr. Potter has also stated that " ... it was not our intention to negate [the May, 1986] assurances ..." given by FE to Najran concerning FE's assumption of responsibility for the performance of UGS. [Potter Dep. 485–86]. As mentioned, *supra*, these assurances of financial responsibility are central to many of the plaintiff's claims. Whether these assurances were actually intended to survive and to apply to the contract between *FI* and Najran is a question not dealt with directly in this opinion.

On August 18, 1982, Mr. Potter wrote to Bruce Meyers, an attorney in the Saudi law office of Gibson, Dunn & Crutcher, to bring him up to date on the Najran transaction. In his letter, Mr. Potter advised Mr. Meyers that the Riyadh bank had "preferred, if not demanded, that Fleetwood be the contracting party because of financial strength and reputation." [Exh. 485]. When Mr. Potter referred to Fleetwood's "financial strength and reputation," he was referring to that of Fleetwood Enterprises. [Potter Dep. 491–92, 497–500].

After reviewing the draft purchase agreements enclosed with Mr. Potter's letter, Mr. Meyers apparently informed Mr. Potter, via a UGS representative, that the contract should be separated into two parts, one for "in-country" components (consultation) and one for "out-of-country" components (pertaining to the mobile homes themselves). This was suggested, according to a memorandum written by Mr. Potter, "presumably for Saudi tax purposes." [Potter Dep. 503–04; Exh. 485].

Thereafter, during the period September 7–11, 1982, representatives of Najran and UGS met with three persons from the Fleetwood organization. Negotiations and contract revisions took place, resulting in the creation of two distinct contracts: one naming Fleetwood International as the contracting party to sell mobile homes to Najran, and one naming GSF (another Fleetwood subsidiary formed in August 1982 pursuant to a certificate of amendment to the articles of incorporation of Fleetwood Housing, Inc., a dormant FE subsidiary) as the party that would supply

consultation services to Najran in Saudi Arabia. [Exhs. 8A & 8B]. Exactly which entity or entities (FE, FI or GSF) were represented at the September 1982 meetings by the three gentlemen from Fleetwood is contested by the parties. Plaintiffs contend that all three represented FE, while defendants maintain that Mr. Potter and one of the others represented FI throughout the negotiations, while the third represented FE, FI, and GSF simultaneously.

During this September 7–11 negotiation period, Mr. Potter, on behalf of FE, wrote to Gibson, Dunn & Crutcher in Saudi Arabia, confirming that "we have separated our draft contract into two distinct contracts...." [Exh. 485]. In response to a question raised by Mr. Potter in the mentioned letter, a Gibson, Dunn & Crutcher attorney responded by telex that it would be advisable to have different parties sign the two agreements; the attorney wrote: "I do think that some of the benefit of using an unrelated name Fleetwood subsidiary [GSF] for the consulting contract is lost if the same person signs both contracts, thereby patently alerting the tax authorities the two contracts are tied together." [Id.].

Notwithstanding the separation of the original agreement into two subagreements, the parties did not formally separate the contract in all respects; payment, for example, was not apportioned between FI and GSF. On October 7, a Najran representative called Mr. Potter to clarify certain matters concerning the project. According to a memorandum to file written by Mr. Potter, Najran expressed its desire, during this conversation, to be sent "a telex to the effect that Fleetwood will receive compensation for its consulting services out of the master L/C; it will not come back to Najran for such amounts." [Exh. B]. Potter supplied the requested telex on October 8; the telex identifies the sender as "Nelson W. Potter-Fleetwood Enterprises, Inc." In this telex Potter advised Najran that GSF had designated Fleetwood International "to receive payment on its behalf for consulting assistance to be provided under the consulting agreement....

The payment will be made from the proceeds of the irrevocable letter(s) of credit to be opened by [Najran] for the benefit of Fleetwood International, Inc." [Exh. 553]. (Mr. Potter is neither an officer, a director, nor even an employee of GSF [Lear Dep. 64, 118]). No separate letter of credit was set up naming GSF as beneficiary.

On September 11, Potter sent a letter to Najran (on FE stationery and signing the letter for FE), enclosing drafts of the purchase agreement for the homes, which named FI as the vendor. Potter sent another letter on October 14 (also on FE stationery and signed on behalf of FE) with later drafts of the purchase and consultation agreements. [Exhs. 8 & 9].

On or about January 1, 1983, Najran executed a consultation agreement with GSF. [Exh. 1A]. Because GSF had no salaried employees, it was necessary to subcontract the work GSF was to perform under the consultation agreement to, *inter alia*, Manufactured Housing Services, a small private company in the Los Angeles area. Although Potter was not an officer or employee of GSF, he signed the agreement with Manufactured Housing Services on January 7, 1983 on behalf of GSF. [Exh. 489]. All payments made to Manufactured Housing Services were made on FI checks, even though FI had no contractual arrangement with GSF Installation Company. [Bingham Dep. 187].

The sale of the 600 mobile homes was accomplished in three stages, involving two purchase orders for a total of 200 mobile homes and a purchase agreement for the remaining 400 homes. By telex dated October 1, 1982 Mr. Potter suggested language for the first purchase order to the effect that, upon execution of suitable contractual documents similar to the earlier-negotiated purchase and consultation agreements, the purchase order would be superseded by those contractual documents. This telex was signed by "N.V. Potter, Fleetwood Enterprises, Inc." [Exh. 16]. On October 2, Najran forwarded its purchase order *to FE*, using language substantially identical to that suggested by Mr. Potter. [Exh. 10]. Defendants con-

tend that by this point in time it was patently clear that FI, and not FE, was the selling party, and that therefore Najran should have been aware that the purchase order should not have been addressed to FE. Shortly after placing the purchase order, however, Najran also opened a letter of credit in favor of FE, in an amount equivalent to the value of the first 100 homes ($5,666,000). Ultimately, FI was named as the beneficiary of this LC, and FE's name was removed therefrom.

On November 19, 1982, representatives from Najran, SABIC, UGS and Fleetwood visited the Douglas, Georgia manufacturing plant of FHG. On December 1, in a letter to Najran confirming the details of that meeting, Mr. Potter wrote that the purposes of this visit to the "Fleetwood Manufacturing plant" had been "to: (a) review furniture components; (b) tour the production line and inspect mobile home units; and (c) meet to discuss specifications and other matters related to supplying mobile homes to [Najran]." A large number of details were discussed at this meeting, matters ranging from production rate and schedule to the necessity of doorbells and hitch balls for the mobile homes. At this meeting, according to the same letter, Najran "presented the original Riyadh Bank letter of credit for the second 100 mobile homes to N.W. Potter of Fleetwood." This letter from Mr. Potter was written on FI stationery and was signed on behalf of FI. [Letter of Dec. 1, 1982 attached to Plaintiff's Amended Complaint].

Najran also addressed its second purchase order for an additional 100 homes to FE on November 23, 1982, although the above-mentioned letter of credit for these homes was ultimately opened in favor of FI. On or about January 12, 1983, Najran entered into a purchase agreement with FI for the final 400 homes, and a letter of credit for $21,600,000 was opened in FI's favor, representing payment in full for the final 400 homes.

Between October 1982 and May 1983, FHG, FHNC, and FHF, all subsidiaries of FE, manufactured the 600 mobile homes for the Najran project, and shipped them to the port of export in Jacksonville, Florida. From Jacksonville, the homes were shipped to Saudi Arabia.

Each home was delivered to the plaintiff with a homeowner's manual, including a written "guarantee," with the name of FE and of the individual subsidiary that manufactured the specific home printed at the bottom of the guarantee form.

Certain warranties and disclaimers on the part of the seller were included in the January 12, 1983 purchase agreement; this agreement also contained an arbitration clause. The two earlier purchase orders had not contained such warranties or disclaimers, nor had they contained an arbitration clause.

B. *The Corporate Relationship of Defendant FE with its Various Subsidiaries*

1. *In general*

The Court finds from the briefs and memoranda of the parties that the following relevant facts are not in dispute with respect to the relationships between FE, FHNC, FHG, FFHF, and as to FE's relations with its subsidiaries in general:

1. The members of the boards of directors of FHG, FF, and FHNC are all identical. [Rule 1.6 Certificate filed by defendants' counsel on July 16, 1984].

2. The FE board of directors consists of John Crean, Dale Skinner, William Weide, Glenn Kummer, C.D. Stretch, Andrew Crean, Milton Packman, and Dr. Douglas Lawson. [Id.].

3. The board of directors of FE determines the board of directors of each of these subsidiaries. [Bingham Dep. at 36].

4. The boards of directors of FHG, FF, and FHNC consist of John Crean, Dale Skinner, William Weide and Glenn Kummer. [Id.].

5. The officers of FE are the same as the officers of all of its subsidiaries, except for two corporations that are not involved in either this action or the California arbitration. [Id.; Bingham Dep. at 34, Lear Dep. at 25].

6. The board of directors of FE selects the boards of directors of its subsidiaries which, in turn, generally determine the officers of the subsidiary companies. [Bingham Dep. at 36].

7. Since January 1, 1980, the officers of FG, FF, and FHNC have been and are the same as the officers of FE. [Lear Dep. at 170].

8. The meetings of the boards of directors of FE's subsidiaries are held on the same day and at the same place as is the meeting of the FE board of directors. [Lear Dep. at 15, 36].

9. The minutes of the meetings of the boards of directors of the subsidiary companies are kept at FE's offices, in Riverside, California. [Bingham Dep. at 39; Lear Dep. at 36].

10. The meetings of the boards of directors of FE and its subsidiaries are held on the same day as are shareholder meetings. [Lear Dep. at 172].

11. There are 35–40 subsidiaries of FE and only one meeting, on the same day, is held for all of those subsidiaries. [Lear Dep. at 22].

12. The FE shareholder meeting lasts for approximately two to three hours. The meetings for the 35–40 subsidiary companies consume a total of thirty to forty-five minutes (approximately one minute per subsidiary company). [Lear Dep. at 23–24; 38].

13. According to the minutes of these meetings, the corporate action taken with respect to all of the subsidiaries is substantially identical. [Lear Dep. at 27].

14. The articles of incorporation, the by-laws, the minutes of boards of directors and shareholders meetings, and the corporate seals of the subsidiaries are kept in the offices of FE, in Riverside, California. [Lear Dep. at 36; Bingham Dep. at 39].

15. The corporate bylaws for all of FE's subsidiary companies generally follow a similar format, and are prepared by a salaried employee of FE, who is also an officer of every FE subsidiary, and who thus prepares bylaws "on behalf of the subsidi-

ary...." [Defendants' Memo in Opposition at 50].

16. While separate financial records for each subsidiary are kept, the financial statements of FE and its subsidiaries are consolidated. [Bingham Dep. at 85–86; Defendants' Memo in Opposition at 50].

17. While loans to subsidiary companies are infrequent, when such a loan is made there is no loan document to that effect, and FE borrows the money for such a loan by drawing on its own line of credit. FE does not charge its subsidiaries interest for such loans, even though FE must pay interest to the bank. No loans have been made to the subsidiaries involved in this litigation within the last three years. FE subsidiaries do not have separate lines of credit. [Defendants' Memo in Opposition at 50; Plaintiff's Reply at 34].

18. FE prepares and enters into a Standard Management Agreement with its operating subsidiaries, the terms of which are ultimately established by FE. It is possible that input from the personnel of the subsidiaries may be taken into account in making decisions concerning the content of the agreements. Under these agreements, the subsidiaries pay FE each year a percentage of their operating profits, normally computed as a percentage of net income of the subsidiaries. The percentage is determined prospectively at the beginning of each new fiscal year, and it is almost always uniform for all subsidiaries. [Defendants' Memo in Opposition at 51; Plaintiff's Reply at 34–35].

19. An employee of FE has described part of the process of determining the above-mentioned percentage as follows:

> In establishing what that percentage should be on a prospective basis the [parent] company would take into consideration such things as projected profitability for the forthcoming year or years, compensation levels of management people in the parent company; in earlier years state tax considerations would come into play if there were any particular benefits to pulling profits from subsidiaries to effect state tax action. [Bingham Dep. at 12].

20. Under the Management Agreement, substantially all costs of FE are allocated back to the subsidiaries on a percentage basis. With respect to research and development, FE employees generally do not keep time cards for work performed on behalf of a subsidiary. [Defendants' Memo in Opposition at 51; Plaintiff's Reply at 35].

21. FE invests the cash of its subsidiaries in cash management programs. FE gathers information on a daily basis from the subsidiaries as to what bank deposits have been made so it knows what is available for investment. FE then draws a depositary transfer check against the subsidiary's local bank account which is then deposited in the parent's account at the Bank of America. [Bingham Dep. at 86–87].

22. FE provides insurance coverage for its subsidiaries under an umbrella policy. [Bingham Dep. at 117, 145; Exh. 484].

23. FE provides legal advice, research and engineering work, and printing services for its subsidiaries. [Bingham Dep. at 118; Exh. 480 (p. 32269)].

24. FE prepared a defined contribution retirement plan which it put into effect for is subsidiaries. [Bingham Dep. at 90].

25. FE determined that an incentive compensation plan, deferred compensation plan, retirement plan, and supplemental benefit plan would be put into effect and implemented these plans. The subsidiaries do not have the right to reject the plans, although FE receives and takes into consideration input from subsidiaries regarding these plans, and considers such input in making determinations about the terms and conditions of the various plans. [Id. at 127; Defendants' Memo in Opposition at 51].

26. The FE board of directors determined what key employees of the subsidiaries were eligible to participate in the long-term incentive compensation plan that became effective in 1977. The 1977 plan was replaced in 1982 with a stock option plan. FE's officers and directors determine the recipients of stock options. [Bingham Dep. at 127–29; Lear Dep. at 150–51; Exh. 481].

27. Almost all of FE's subsidiaries are permitted to use the FE logo. [Bingham Dep. at 114–15].

28. The subsidiaries of FE have the right to use FE's service and trademarks, and no fees are paid to FE by the subsidiaries for such use. [Lear Dep. at 46–47, 176; Bingham Dep. at 59].

29. FE makes purchasing decisions for its subsidiaries with respect to large national purchases, though not with respect to day-to-day purchases. [Defendants' Memo in Opposition at 52; Plaintiff's Reply at 39].

30. All subsidiaries involved in this litigation and in arbitration before the ICC are utilizing the services of the same law firm, Gibson, Dunn & Crutcher, although other law firms are employed by FE and its various subsidiaries with respect to the ordinary conduct of their business. [Defendants' Reply at 52].

31. FE owns 100% of the stock of FHF, FHG, and FHNC. [Lear Dep. at 171–72].

32. FE provides in its own name a "Full One Year Warranty" to every consumer purchasing a mobile home manufactured by its subsidiaries, and FE identifies itself as the company responsible for addressing consumer complaints in the federally-mandated "Certificate of Compliance" found inside of every mobile home manufactured by FE's subsidiaries. [Exhs. 447 & 557].

### 2. Corporate Relationship Between FE, FI, and GSF

The Court finds the following relevant facts not to be in dispute with respect to the relationship between FE, FI and GSF.

33. The FI and GSF boards of directors consists of John Crean, Dale Skinner, William Weide and Glenn Kummer (all board members of FE). [Rule 1.6 Certificate filed by defendants' counsel on July 16, 1984].

34. The officers of GSF and FI are the same officers as those of FE. [Id.].

35. In connection with the Najran transaction, FE often paid the travel expenses incurred by its subsidiaries' employees in travelling to and from Saudi Arabia. [Bingham Dep. at 190, 192, 193, 198, 201–

03; Lear Dep. at 122–23; Exhs. 490, 491, 499, 500].

36. In connection with the Najran transaction, it was normal practice for FI to make payments to those having a contractual relationship with GSF, even though no contractual relationship exists between FI and GSF. [Lear Dep. at 121; Bingham Dep. at 187, 197; Exhs. 492–95, 497, 498].

37. On many occasions, FI checks were used to pay for services rendered to GSF. [Exhs. 492–95, 497, 498].

38. When payments were made under an L/C to Fleetwood International for particular mobile homes, full credit was given to the manufacturing plant. FI kept no portion of the payment for itself. [Bingham Dep. at 221; Exh. 512].

39. FI is a wholly owned subsidiary of FE. [Bingham Dep. at 43].

40. FI has no separate corporate offices; it is located in the corporate offices of FE. No particular office space within FE is designated as "Fleetwood International." [Bingham Dep. at 43, 46; Lear Dep. at 41; Potter Dep. at 481–83].

41. The Fleetwood Enterprises' employee roster of September, 1984, which includes listings of the employees of FE subsidiaries, does not list FI. [Exh. 479]. The people who run FI are and always have been salaried employees of FE. [Bingham Dep. at 108].

42. As of August, 1982, when FI became a contracting party on the draft Purchase Agreement, FI's only asset was the stock of Fleetwood Canada Ltd. (FC), a recreational vehicle manufacturing plant. At present, the assets of FI include cash and inter-company accounts receivable. FI's only non-cash asset is the stock of FC, a wholly owned subsidiary. FI does not own any personal property or real estate; it has no contingent assets or liabilities. [Bingham Dep. at 51–55].

43. The financial statements of FI are generated by FE, and the financial books and records of FI are kept by the FE "financial group" at its corporate headquarters in Riverside, California. [Lear Dep. at 43–44].

44. FI does not have its own line of credit. [Bingham Dep. at 54].

45. Mr. Nelson Potter has never seen any documents that authorize him to act on behalf of FI. He has said that "[he] considered [himself] to be Fleetwood Enterprises and Fleetwood International at the same time." Mr. Potter has no FI business cards, and had none in August, 1982, when FI became the contracting party in the Najran transaction. Mr. Potter's business cards reflect that he is associated with FE. Mr. Potter has testified that his authority to make proposals to third parties without getting approval from the board of directors "was simply understood." [Potter Dep. at 118, 482–84].

46. To draw a check on FI's account, the controller needed authorization from FI. The controller believed that Mr. Potter had authorization from FI to authorize the controller to write such checks. [Bingham Dep. at 183–84].

47. In all previous sales of mobile homes destined to Saudi Arabia of which Mr. Potter has knowledge, FE was the assignee of the letters of credit involved. [Potter Dep. at 74–106].

48. Mr. Potter commented on his intermittent use of FE and FI stationery in communications with Najran as follows:

> The preponderant number of our communications on a daily basis were on [FE] stationery. And quite often we would utilize stationery without giving it a great amount of thought as to which letterhead we were using or how we signed our letters.... We used [FE] stationery because that was our mode of communication rather than attempting to communicate on no stationery at all. It was our custom to use, for the most part, [FE]'s stationery. It was available and that was our customary practice.... We didn't give it an awful lot of thought as to which stationery would be used for which communications other than ... the bank communications we tried to make sure they would be on [FI] stationery." [*Id.* at 541–44].

49. GSF is a wholly owned subsidiary of FE. [Lear Dep. at 57–58]. GSF has no stationery and it is disputed whether GSF has an office. GSF uses the telephone number and corporate address of FE. [Bingham Dep. at 185]. GSF is not listed in the 1984 FE employee roster. [Exh. 479]. GSF has no assets or liabilities. GSF may reflect on its balance sheet a nominal amount in cash and capital stock. Thus, the only asset of GSF is the amount of cash paid-in for the stock when the company was organized. [Bingham Dep. at 55–56].

50. GSF has no separate line of credit. [*Id.* at 57]. GSF has no employees, with the possible exception of Mr. Jack Winnick. Mr. Winnick, however, is not a "salaried" employee of GSF. He has an employment contract with another Fleetwood subsidiary. GSF holds a license through Mr. Winnick for installation of components for site-built housing. [*Id.* at 47–80].

51. Mr. Lear, the General Counsel of FE, is the custodian of the articles of incorporation, the bylaws, and the shareholder and board of directors meeting minutes for GSF. [Lear Dep. at 66].

52. Both FI and GSF are consolidated with FE for federal and state tax purposes. [Bingham Dep. at 58].

53. During the time that the mobile homes in question were shipped to Najran in Saudi Arabia in 1983, the transaction received substantial media coverage. In all articles and other materials submitted to the Court as exhibits, the media profiled only FE, never mentioning that FI was the contracting party or that there was a separate consulting agreement with GSF. Examples of such coverage are found in *The Jacksonville Seafarer* of March, 1983, [Exh. 639], a press release of April, 1983 from the Security Pacific National Bank, [Exh. D], and the July, 1983 issue of *Mideast Business Exchange.* [Exh. 660]. In the February 9, 1983 Journal of Commerce, the following language appeared:

> The competition for the contract to produce the mobile homes was intense, involving companies throughout the world, said Nelson W. Potter, Fleet-

wood's Director of International Housing and Real Estate Development.

Mr. Potter contended winning the contract was due to the fact that "the Saudis' major concern is time" and no other company could match Fleetwood's record of having a home ready for occupancy five days after it was unloaded from the ship.

[Exh. C].

C. *Post-contractual Difficulties and the Procedural Background of the Instant Dispute*

As the mobile homes began to arrive in Saudi Arabia, Najran allegedly discovered numerous instances of faulty workmanship, inadequate packing, equipment shortages and substitutions, design defects, and other related problems in the new homes. The extent of any such problems, the effectiveness of the various warranties and disclaimers contained in the contracts discussed, *supra,* and the adequacy or inadequacy of FI's response (and the propriety of certain of Najran's actions in attempting to rectify the situation)—all are matters of dispute. The relations between the defendants and the plaintiffs over the course of 1983 were by no means warm. The nature of the situation is perhaps best indicated by a letter from Mr. Glenn Kummer, President of Fleetwood Enterprises. Writing on August 16, 1983, in response to a letter from the president of Najran, Mr. Kummer stated that "in light of the continuing controversy over the past several months ... I do not believe it appropriate at this time to send any of our other people to Saudi Arabia [for the grand opening of the Jubail project]."

On December 17, 1983, Najran ultimately filed a Notice of Intent to arbitrate with the ICC. On December 26, 1983, Najran filed its Statement of Claim with the ICC, seeking compensatory and punitive damages against Fleetwood International, for breach of the various contracts under which the 600 homes were sold. On March 2, 1984, Najran amended its Statement of Claim to include as an additional defendant FE, FI's parent company, claiming that FE

had induced it to enter into contractual relations with FI through its "guarantees and inducements," and claiming also that FE is and was at all relevant times the alter ego of FI.

On March 12, 1984, FI filed an Answer and Counterclaim with the ICC contending that claims arising out of the sale of the first 200 mobile homes sold to Najran were not arbitrable because of the absence of arbitration clauses from the two initial purchase orders. On April 18, 1984, FE filed a Refusal to Arbitrate with the ICC, denying that it had induced Najran to enter into the contract with FI, denying alter ego status with respect to FI, and claiming that it was not bound by any of the terms, including the arbitration clause, of the purchase agreement between FI and FE.

On June 7, 1984, FE filed suit in California state court, praying for declaratory and injunctive relief and contending that it was entitled to a declaration that it has no legal responsibility on any basis to Najran. FE, at the time, claimed that it was *entitled* to such a determination prior to the commencement of arbitration.

On June 8, 1984, Najran filed suit in the United States District Court for the Southern District of Georgia-Waycross Division against FE and its subsidiaries FHF, FHG, FHNC and FI. Najran brought claims, *inter alia,* for declaratory judgment on the issues of guaranty and alter ego; Najran also alleged various breaches of express and implied warranties, violation of the Magnuson-Moss Warranty Act, fraud and deceit, RICO violations, etc. Najran maintained that there existed an actual and justiciable dispute between the parties, which the Court had jurisdiction to resolve. Defendants answered on July 16, 1984, asserting numerous defenses and counterclaims against Najran. As FE had done in the California state court action, the defendants in the case at bar initially argued that there existed a justiciable dispute, and that the court "ha[d] the duty to resolve such dispute in advance of the commencement of any arbitration proceeding between [Najran and FI]."

On July 11, 1984 defendants filed with the federal court a Motion for Order Enjoining Arbitration, seeking to stay arbitration and to obtain an immediate ruling on the alter ego issue. The Court denied that motion on August 13, 1984. On December 13, 1984 defendants filed a motion to dismiss plaintiff's Magnuson-Moss claims, contending, *inter alia,* that plaintiff could not state a cause of action under that consumer-oriented statute. Upon motion by all parties, this action was transferred to the Savannah Division on January 14, 1985. By stipulation of the parties on February 20, 1985, the defendants' counterclaims, substantially similar to those raised in the pending arbitration, were dismissed without prejudice, as were plaintiff's RICO claims, and plaintiff's claim against FI. The stipulation also made provisions for plaintiff to attempt to bring GSF (FE's consulting subsidiary) before the arbitral tribunal, and the parties agreed in the stipulation to put before the ICC the questions whether and to what extent the terms of the January 1983 purchase agreement applied to the sale of the first two hundred homes. This latter issue has been resolved by the arbitral tribunal, all of the terms of the January purchase agreement, including the arbitration clause, having been found by the ICC to be applicable with respect to the sales of all 600 homes. An amended complaint was filed with this Court by the plaintiff in April 1985, reflecting the changes worked by the parties' February 1985 stipulation. Defendant answered that complaint. Certain questions of law have been dealt with in an interim award of the ICC dated February 20, 1986.

As matters stand, Najran, FI and GSF are currently before the arbitral tribunal in California, while Najran, FE, FHF, FHG, and FHNC are currently before this Court. According to the parties' representations, made to this Court on April 22, 1986, the arbitration will not begin full proceedings until early 1987.

II. *Analysis*

With the foregoing facts in mind, the Court can now assess the various claims put forth by the parties. Specifically, the

Court must deal with defendant's motion to dismiss plaintiff's Magnuson-Moss warranty claims, and plaintiff's motion for summary judgment on its declaratory judgment claim with respect to the alleged alter ego status of FE and its various subsidiaries.[1]

### A. *Alter Ego Claims*

#### 1. *Case or Controversy*

■ Defendants contend that, not only is it improper to resolve plaintiff's alter ego claim by summary judgment, but also the claim is not "ripe" for the issuance of a declaratory judgment, because there is no "case or controversy" before the Court. Defendants' argument is unpersuasive.

Plaintiff seeks this judgment in order, *inter alia*, to determine whether it will have access to the assets of the parent corporation, FE, in the event that plaintiff recovers a substantial judgment against the subsidiaries, FI and GSF, in the arbitration in California. It is true that plaintiff may not prevail on its underlying claims. It is also true that, if the arbitral tribunal does not award plaintiff a large sum, defendant FI might be able to afford the judgment.[2] Nevertheless, there appears to be the very real possibility that the award, if any, could exceed the several million dollar valuation of FI. More real still are the enormous litigation expenses that plaintiff will incur in presenting its case in the arbitration. A determination by this Court, either negative or positive, on plaintiff's claim will surely affect the decisions of the parties as to how and whether to continue this already protracted legal warfare. Resources, both judicial and arbitral, may be saved or more efficiently utilized, if this Court addresses the central question of alter ego status. This case is appropriate for the discretionary exercise of the Court's jurisdiction to hear a declaratory

judgment claim. *See generally Edwards v. Sharkey,* 747 F.2d 684 (11th Cir.1984). The defendants, for purpose of staving off this claim, now contend that there exists no justiciable case or controversy. Yet defendants have maintained, at earlier points during this litigation, that the alter ego question does indeed give rise to a case or controversy over which this Court has jurisdiction. The Court agrees with the defendants' earlier interpretation.

#### 2. *Summary Judgment*

Defendants have properly pointed out that the movant in an action for summary judgment "bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983). "Summary judgment should be entered only if 'there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law.'" *Clemons v. Dougherty County, Ga.,* 684 F.2d 1365, 1368 (11th Cir.1982) (citing Fed.R.Civ.P. 56(c)). All reasonable doubts about the facts should be resolved in favor of the non-movant. If the record presents factual issues, the court must not decide them; "it must deny the motion and proceed to trial." *Id.* at 1369 (citations omitted). Even where the facts before the court are undisputed, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment", *id.,* and a district court is "obliged to resolve all reasonable factual inferences from the record in favor of ... the non-movant." *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1216 (5th Cir.1985).

On the other hand, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

---

1. The Court expresses no opinion at this time in connection with the merits of plaintiff's motion for summary judgment on the first count of its amended complaint, wherein plaintiff contends that there existed a guaranty contract between FE and Najran. Suffice it to say that, if there is a legal basis for this claim, and if this Court's ruling on the alter ego claim does not render the matter moot for most purposes, there cer-

tainly exist triable issues of fact that render the issue inappropriate for resolution by summary judgment.

2. Whether GSF could afford to pay a judgment rendered against it does not appear to have been addressed by the parties, though this would seem to be an open question.

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, — U.S. — —, 106 S.Ct.2505, 2510, 91 L.Ed.2d 202, 211 (1986) (emphasis in original). Furthermore, "[i]f the evidence [presented by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at —, 106 S.Ct. at 2511, 91 L.Ed.2d at 212 (citations omitted).

### 3. *The Applicable Substantive Law*

Proper application of the standards outlined above to plaintiff's alter ego claims demands an understanding of the relevant substantive law. The Court need not engage in a lengthy choice of law analysis,[3] because it is clear that the laws of both California and Georgia, the only two states having any significant contacts with the transaction at issue, are substantially identical on the alter ego question.

Georgia law on alter ego is succinctly stated in *Florida Shade Tobacco Growers, Inc. v. Duncan*, 150 Ga.App. 34, 256 S.E.2d 644 (1979): "[I]t must appear that the subsidiary is a mere instrumentality of the parent, 'that the separate personalities of the corporation and the owners no longer exist; and to adhere to the doctrine of corporate entity would promote injustice or

protect fraud.'" *Id.* at 34–35, 256 S.E.2d 644, quoting *Farmers Warehouse of Pelham v. Collins*, 220 Ga. 141, 150, 137 S.E.2d 619 (1964). *See also Avanti Group (USA), Ltd. v. Hart, Schaffner & Marx*, 173 Ga.App. 831, 328 S.E.2d 433 (1985).[4]

California law on the subject is to the same effect. "The alter ego doctrine applies where (1) such a unity of interest and ownership exists that the personalities of the corporation and the individual are no longer separate, and (2) an inequitable result will follow if the acts are treated as those of the corporation alone." *RRX Industries, Inc. v. Lab-Con, Inc.*, 772 F.2d 543 (9th Cir.1985).

### 4. *FHF, FHG, FHNC*

Applying either California or Georgia law to the facts as outlined by plaintiff, the Court cannot conclude that Najran has carried its burden concerning the alter ego relationship of FE with respect to FHF, FHNC, and FHG.

Najran has established, without doubt, that FE exercises a very substantial degree of control over these three subsidiaries. There is undisputed evidence that the boards of directors and officers of the parent and subsidiaries are substantially identical. Also, the financial arrangements between FE and these subsidiaries (with re-

---

**3.** As the parties have accurately pointed out, the choice of law question in this case is indeed complex. It should be noted in passing, however, that the Court cannot approve defendants' interpretation of the problem, by which defendants maintain that Georgia law applies to this contract because "the last act essential to the completion of the contract" occurred in Georgia. The "last act essential to the completion of the contract" noted in *General Telephone Co. of the Southeast v. Trimm*, 252 Ga. 95, 311 S.E.2d 460 (1984), as a factor to look to in determining which law should be applied in a suit on a contract, refers to an act going to the execution of the contract, rather than, as defendants have interpreted the phrase, to its performance. While, under *Trimm*, contemplated performance in Georgia may be relevant, *id.* at 96, 311 S.E.2d 460, it seems that there are sufficient peculiarities in the contract at issue that the application of Georgia law might not be deemed appropriate by a Georgia court. On the other hand, both parties have pointed out that Georgia law might apply to the alter ego issue because this is a matter that is outside of the contract

and that implicates state public policy concerns. *See Ryder Truck Lines, Inc. v. Goren Equipment Co.*, 576 F.Supp. 1348, 1354 (N.D.Ga.1983). The court expresses no opinion on this possibility.

**4.** There is little merit to plaintiff's contention that there is a difference recognized by Georgia law between alter ego suits seeking to pierce the veil between parent and subsidiary, and such suits where the veil of a corporation is sought to be pierced in order to impose liability upon individual shareholders. Plaintiff asserts that in the former situation Georgia law requires no more than a showing that the subsidiary is a mere instrumentality of the parent, and that only in the latter situation is a showing of fraud or injustice required. Neither *Farmers Warehouse, supra*, not *Independent Bankers Assn. of Ga., Inc. v. Dunn*, 230 Ga. 345, 197 S.E.2d 129 (1973), supports such an assertion, and any inferences that might creatively be drawn from the vague language of those decisions are not convincing, in light of the great weight of Georgia law to the contrary.

spect to, *inter alia,* loans, employee benefit and insurance plans, research and development costs, mandatory annual percentage payments to the parent, and FE investment of subsidiary funds) do tend to indicate a control quite possibly inconsistent with corporate autonomy. Similarly, defendants' assertions that the subsidiaries are·in fact autonomous, because decisions are made by the respective boards of the subsidiaries, seem at least somewhat hollow, given the identity of board membership between FE and its 100% wholly owned subsidiaries.

Yet "[i]t is true that the separate identity of a subservient corporation is not destroyed *merely* by the fact that it is used by the parent for the parent's ends ... or even by the fact that they have the same officers...." *Trans-American Communications, Inc. v. Nolle,* 134 Ga.App. 457, 459–60, 214 S.E.2d 717 (1975) (citation omitted). The Court finds that, while Najran has gone far toward proving the necessary elements of corporate unity as required by the first prong of the alter ego test, it cannot be said that there could be "but one reasonable conclusion" on this issue from the evidence presented. *Anderson, supra,* — U.S. at ——, 106 S.Ct. at 2511, 91 L.Ed.2d at 213.

In addition, as to these subsidiaries, there is insufficient evidence before the Court to support the second prong of the alter ego test—that to maintain the corporate entity would lead to an "inequitable result" under the California standard, *RRX Industries, supra,* or that any of these subsidiaries " 'was a sham, or that it was used to defeat a public convenience, to justify a wrong, protect fraud, defend crime, [nor does there appear to be] any other reason which in equity and good conscience would justify the disregard of ... [its] ... separate entity,' " *Bass v. Citizens & So. Nat. Bank.* 168 Ga.App. 668, 670 309 S.E.2d 850 (1983), quoting *Condenser Service & Engineering Co. v. Brunswick Port Authority,* 87 Ga.App. 469, 475, 74 S.E.2d 398 (1953), as the Georgia rule would require. Therefore, summary judgment on the alter ego question with respect to these FE subsidiaries would be inappropriate.

### 5. *FI and GSF*

The Court reaches a different conclusion as to the alter ego status of FE with respect to FI and GSF. While mindful that "great caution should be exercised when disregarding the corporate entity," *Bass, supra,* 168 Ga.App. at 670, 309 S.E.2d 850, and recognizing that the alter ego inquiry is "a fact question which should ordinarily be submitted to the jury," *Luckett v. Bethlehem Steel Corp.,* 618 F.2d 1373, 1379 (10th Cir.1980), or decided after a full hearing, " 'it need not be submitted [or judgment withheld on the issue] if the evidence discloses no real question of fact.' " *Id.*

All of the elements of control mentioned above with respect to FHF, FHG, and FHNC are equally pervasive in FE's relations with FI and GSF. But, in contrast to the subsidiaries already discussed, the FI and GSF subsidiaries had no employees (GSF arguably had one employee), and FI had no office space of its own. It is uncontroverted that FE money was spent in transporting these subsidiaries' employees to and from Saudi Arabia. It is undisputed that FI never retained any of the proceeds distributed to it under the L/Cs involved in the Najran transaction. More significant, the deposition testimony of FE/FI personnel indicates a general confusion as to exactly "who was acting for which company when." Perhaps most telling are Mr. Potter's comments with respect to the intermittent use of FE and FI stationery, *see supra.* While always careful to use FI stationery in relations with the bank distributing proceeds from the L/Cs, corporate formalities in this regard were viewed as unimportant at most other times. The Court takes notice of the fact that it was not only in the use of stationery, but also in choosing the return address for various telexes, that Fleetwood personnel had difficulty determining the company issuing outgoing correspondence. There would seem to be an affirmative choice, with respect to the naming of FE as the return addressee on telexes, that cannot easily be explained away. In addition, Mr. Kummer's letter, written in August 1983 on behalf of FE, indicates that he believed that there was at

least some relationship between FE and Najran at that late date. Also, Mr. Potter's issuance of FI checks to third parties, in satisfaction of GSF's contractual obligations—when FI had no contractual relations with GSF—is yet another example showing that corporate formalities in the conduct of FE/FI/GSF affairs were ignored to a very great degree.[5] Finally, in attempting to point out that FE should not be found liable for any consequential damages arising from the Najran transaction on plaintiff's Magnuson-Moss claims, *see infra*, defendants point to the wording of the contract between Najran and *FI*, the ostensibly unrelated subsidiary, claiming that because that contract included language of limitation FE cannot be held liable for such damages. If FE, FI and GSF were indeed separate entities, such limiting language would be completely irrelevant to the liability, if any, of FE as manufacturer.

■ All of these factors point to such complete lack of independence, and total nonexistence of the normal indicia of corporate separateness, between FE, FI and GSF that no "reasonable jury" could find that Najran has failed to carry its burden with respect to the first prong of the alter ego test.[6]

■ As to the "second prong" of the alter ego test, it is clear that inequity would result from recognition of corporate separateness between FE, FI and GSF. In this regard, it should be noted that conduct rising to the level of actual fraud is not required under either California or Georgia law, *RRX Industries, supra*, at 546; *Kohn v. Kohn*, 95 Cal.App.2d 708, 214 P.2d 71 (1950); *Jones v. Cranman Sporting Goods*, 142 Ga.App. 838, 237 S.E.2d 402 (1977). While fraudulent or illegal acts often justify piercing of the corporate veil, the alter ego inquiry is conducted on a case by case basis and, as noted above, if *equity* and *good conscience* dictate in a given situation that the corporate veil should be disregarded, then piercing this veil is proper. *Bass v. Citizens & So. Nat. Bank, supra; Mesler v. Bragg Management Co.*, 39 Cal.3d 290, 216 Cal.Rptr. 443, 702 P.2d 601 (1985): "The essence of the alter ego doctrine is that ... liability is imposed to reach an equitable result."

The facts indicate that FE has profited from the transaction at issue by virtue of the substantial favorable publicity that accompanied *and followed* the consummation of the contract between FI, GSF and Najran. *See supra*. There is no dispute that Mr. Potter is quoted in a Jacksonville newspaper as having claimed that the past performance and reputation of "Fleetwood" were the key factors that led to the selection of Fleetwood by Najran as a contractual partner. The other articles presented to this Court as exhibits all make glowing reference to FE, and none makes reference to FI or GSF. Yet FE has not produced any evidence that it tried to contact the newspapers involved to correct their "error" as to who the real contracting parties were. Similarly, it is not denied that Mr. Potter neglected to contact the Security Pacific National Bank to alert it to inaccuracies either in Security Pacific's telexes to Saudi Arabia concerning the financial status of FE, or in that bank's "erroneous" press release concerning the awarding of the contract to FE.

As a matter of public policy, it would not be appropriate to allow FE flagrantly to disregard corporate formalities, to benefit from such disregard, and to then hide behind the legal fiction of corporate separateness for purposes of this litigation. The Court finds FE's willingness to accept the general applause of the business community directed toward FE's prowess in "landing" this contract, and FE's subsequent

5. Defendant contends that such a payment made by one subsidiary for the benefit of another is irrelevant to the issue of whether *FE* is the alter ego of one or several of its subsidiaries. Actually, such a fact is entirely relevant as yet another indicator of the total absence of corporate formalities between FE, FI and GSF with reference to the Najran transaction.

6. "[T]he 'genuine issue' summary judgment standard is very close to the 'reasonable jury' directed verdict standard." *Anderson, supra,* —— U.S. at ——, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

disclaimer of interest in the transaction, to be truly offensive.[7]

In a case the facts of which are in many ways remarkably similar to those of the case at bar, the Second Circuit affirmed the holding of the district court that a wholly owned international trading subsidiary and its parent company were alter egos. In *Farkar Co. v. Hanson DISC, Ltd.*, 583 F.2d 68 (2d Cir.), *modified in other respects*, 604 F.2d 1 (2d Cir.1979), the Court of Appeals examined the district court's opinion, which had held that, while there was no overt act of fraud involved in the formation or operation of the subsidiary, nevertheless the parent should be bound as an alter ego to arbitrate pursuant to an agreement signed by the subsidiary. The district court had based its finding upon what it viewed to be the unique law of the State of Washington, which, apparently, allows the "fraud" prong of the alter ego test to be satisfied by a mere showing that a violation of duty would result from giving due regard to the corporate fiction. 441 F.Supp. 841, 845 (S.D.N.Y.1977). On appeal, the Second Circuit held:

> The issue of fraud or potential fraud, as is generally understood or as "distinctly used in Washington law," in [the subsidiary's] incorporation and operation plays no part in the resolution of this case. There is no evidence of fraud; [the subsidiary] was incorporated for the legitimate and limited purpose authorized by Congress.
>
> The reason for the exclusion of these matters from the ultimate decision as to the liability of [the parent] to submit to arbitration should be obvious—under any applicable law the result would be the same. "... [T]he facts, as found by the trial court, showed that the corporate veil was so diaphanous that it did not even require piercing."

583 F.2d at 71. The *Farkar* case thus suggests that absolute domination by one company of another can suffice for a holding that a parent and subsidiary are alter egos. In this case, there is not only a diaphanous (if not transparent) veil; there are also facts more compelling (and inequity more substantial) than those evident in the *Farkar* case. A finding in favor of plaintiff on this part of its alter ego claim is therefore appropriate.

■ The necessary corollary of a rule holding that an alter ego determination is "usually" or "ordinarily" one for the jury is that there will appear unusual or extraordinary cases in which there is no genuine issue of material fact. In this case, the evidence is "so one-sided that [the movant] must prevail as a matter of law." *Anderson, supra,* —— U.S. at ——, 106 S.Ct. at 2512, 91 L.Ed.2d at 214. It would be a waste of judicial resources to leave the determination of this issue for trial, inasmuch as the defendants have brought forth nothing more than conclusory and inadequate arguments in opposition to this motion. It does not appear that, at what would prove to be a protracted and needless hearing, defendants could do any more than restate and rehash the points already found in their briefs and affidavits. "Summary judgment procedure is properly regarded not as a disfavored shortcut but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* —— U.S. ——, ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265, 276 (1986). Accordingly, the Court grants plaintiff's motion for partial summary judgment in part, and declares FE to be the alter ego of its subsidiaries, FI and GSF.

### B. *Magnuson-Moss*

The instant dispute involves the alleged breach of various duties arising out of the

---

**7.** That FI had assets not related to the transaction at issue renders FI no less an instrumentality of FE, and offers insufficient reason for recognizing the corporate fiction. Furthermore, the Court's decision is in no way dependent on whether FE "guaranteed" or agreed to act as a surety with respect to the contract signed with Najran. As noted above, the Court does not deal with that issue in this opinion. Thus, whether Najran "knew" that it was dealing with FI, as opposed to FE, when it signed the purchase orders or the purchase agreement is irrelevant to this decision.

volume sale of 600 mobile homes to a commercial buyer. The plaintiff alleges, among other acts of nonfeasance and malfeasance, breaches of contractual and implied warranties on the part of the defendants. Plaintiff Najran has urged this Court that a claim can be stated against the defendants under the Magnuson-Moss Federal Trade Commission Improvement Act (the Act).[8] The Act, *inter alia,* works to set guidelines for the content of written consumer warranties and to impose liability upon any "warrantor"[9] who breaches an implied warranty or fails to honor the terms of a written warranty, issued to a "consumer,"[10] with respect to the sale of "consumer goods."[11] Defendants have moved to dismiss plaintiff's Magnuson-Moss claims.

■ The Court's determination as to the applicability of the Act is significant because, if the Act applies, defendants can be held liable for any breaches of implied warranties of fitness and merchantability that may be found to have occurred. Also of significance is the fact that the Act allows, among other things, for recovery of attorney's fees by a consumer who prevails on a Magnuson-Moss claim in a state or federal court.

Before setting off into the largely unexplored regions of the Act's applicability to volume sales in a commercial context, it should be noted that there are few, if any, significant landmarks pointing out the proper path. The legislative history of the Act offers little guidance,[12] and case law with respect to this particular aspect of the Act is nonexistent.

■ At the outset, it is clear that no claim under the Act can be brought unless the product involved is a "consumer product." In the instant case, however, there is little room for doubt, and defendants do not dispute, that a mobile home is a consumer product within the meaning of the Act. *See, e.g., Drouin v. Fleetwood Enterprises,* 163 Cal.App.3d 486, 209 Cal.Rptr. 623 (1985). It is also clear that a commercial buyer can assert a claim under the Magnuson-Moss Act if it has purchased a consumer product covered by an appropriate warranty. It is the "normal use" of a product as a consumer product that renders coverage by the Act appropriate. That is, if a *type* of product is "normally used" for consumer purposes, then that product in any given case is a consumer product within the meaning of the Act regardless of whether it was used for commercial purposes. *See generally Crume v. Ford Motor Co.,* 60 Or.App. 224, 653 P.2d 564 (1982); *Barco Auto Leasing Corp. v. PSI Cosmetics, Inc.,* 125 Misc.2d 68, 478 N.Y.S.2d 505 (1984); *Business Modeling Techniques, Inc. v. General Motors Corp.,*

---

**8.** 15 U.S.C. § 2301, *et seq.*

**9.** Under the Act, a "warrantor" is "any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty." 15 U.S.C. § 2301(5). In turn, a "supplier" is "any person engaged in the business of making a consumer product directly or indirectly available to consumers." 15 U.S.C. § 2301(4).

**10.** A "consumer" under the Act means "a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the contract, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract)." 15 U.S.C. § 2301(3).

**11.** A "consumer product" is defined as "any tangible personal property which is distributed in commerce and which is *normally used* for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed)." 15 U.S.C. § 2301(1) (emphasis added).

**12.** A literal reading of the Magnuson-Moss Act is only a starting point for giving meaningful content to the statute which has been variously described as "disappointing", "opaque", and a "product of poor drafting". A review of the legislative history gives but limited solace. That review is the legal equivalent of an archaeological dig.
*Skelton v. General Motors Corp.,* 500 F.Supp. 1181, 1184 (N.D.Ill.1980), *rev'd on other grounds,* 660 F.2d 311 (7th Cir.1981), *cert. denied,* 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982).

123 Misc.2d 605, 474 N.Y.S.2d 258 (1984). *See also* 16 C.F.R. § 700.1.

On the one hand, however, the Act notes that it does not apply where the buyer has purchased the consumer product for purposes of resale, 15 U.S.C. § 2301(3), while on the other hand it has been asserted by the commentators that the Act (although not all regulations promulgated pursuant to it) *would* apply to protect a commercial buyer of, for example, a fleet of cars, where such a buyer intends to lease out the automobiles. *See* Banks, *The Magnuson-Moss Warranty Act: An Untapped Adjunct to the Law of Redhibition*, 26 Loy.L. Rev. 263, 276 n. 83 (1980); Eddy, *Effects of the Magnuson-Moss Act Upon Consumer Product Warranties*, 55 N.C.L.Rev. 835, 852 n. 57 (1977).

■ In the case at bar, plaintiff asserts that, because plaintiff was to lease the mobile homes to individual residents for a period of five years, and because SABIC had the option, but not the duty, to buy the homes at the end of that period, the mobile homes should be considered consumer products. Plaintiffs point to the fact that SABIC has categorically refused to exercise its option (because of the homes' allegedly defective condition) as an additional factor supporting plaintiff's argument on this point.[13] Defendants, in turn, argue that there is no *law* (*v.a.v.* law review commentary) to support the contention that a volume purchaser of consumer goods for purposes of lease would be entitled to protection under the Act, pointing out that a volume commercial purchaser is certainly not the kind of "easily beguiled household consumer" that the Act was designed to protect. Defendants further maintain that clearly Najran did purchase the mobile homes for purposes of resale, as is evidenced by the contractual arrangement between Najran and SABIC.

Plaintiff points to numerous papers, letter, and documents to support its claim that warranties were made to it by the defendants. Najran points, *inter alia*, to the written assurances of FE with respect to its assumption of responsibility for the quality of the goods at that stage in the negotiations when UGS was to be Najran's contractual partner. Plaintiff also directs the Court's attention to the written assurances issued by UGS, and to a number of letters and representations made by the "actual" parties to the contract (FI and GSF). Finally, plaintiff points to the "full one-year warranties" (from FE and the respective manufacturing subsidiaries) which accompanied each mobile home.

■ Defendants, of course, maintain that the Act simply does not apply, but go on to argue that, even if the Act does apply, the defendants cannot be subjected to liability for consequential damages and the like because "the Purchase Agreement (between FI, GSF and Najran) conspicuously provided that the plaintiff's remedies were limited to repair and replacement...." Such limitation of liability for consequential damages is permitted under the Act, so long as the limiting language is conspicuous on the face of the warranty document. 15 U.S.C. § 2304(a)(3). Defendants make no reference to the disclaimer of implied warranties in this same contract. Avoidance of this issue was most likely due to the fact that such warranties cannot be disclaimed where the Act applies. 15 U.S.C. § 2308. Defendants similarly ignore the fact that the full one-year warranty includes *no* disclaimer of implied warranties.

■ The Court finds that whether a volume commercial purchaser can invoke the protections of the Magnuson-Moss Act

---

**13.** This fact, *by itself,* is irrelevant. A retailer who buys with the intention of selling an object to a consumer has certainly purchased "for purposes of resale" regardless of whether the consumer refuses to buy. However, that Najran intended to lease out the homes makes a determination in this area more complex. The "not for purpose of resale" requirement does indicate that a purchaser who does not intend to utilize consumer goods should not be protected by the Act, but it may be that a purchaser who does use the consumer goods for some period of time, and who purchased the goods with the intention of using them, is entitled to the Act's protection. Certainly a fleet of cars is generally bought by a leasing company with the intention of reselling the cars after a certain number of years.

is not a question to be determined by a rigid *per se* rule. The Court agrees that there may be circumstances under which a commercial volume purchaser can state a claim under the Magnuson-Moss Act. But the determination of when coverage is appropriate must be made on a case by case basis. Factors militating against coverage would include: contractual terms or circumstances surrounding the making of a contract indicating that the contract price was decreased by virtue of the commercial consumer's agreement to warranty limitation by the supplier, and facts indicating that it would have been objectively unreasonable for the commercial consumer to expect the full range of duties imposed on a warrantor under the Act in light of the circumstances surrounding the transaction. Another factor to consider (which, though not dispositive, would have some weight) would be whether the goods were sold domestically or, as in this case, for purposes of export. It is not clear whether the legislature intended that the Act be applied in full force with respect to consumer products exported to foreign jurisdictions, *see* 16 C.F.R. § 700.1, and it would seem that the policy factors supporting the passage of the Act are much less strong, and the burdens on the supplier much greater, when goods are intended to be used overseas. As a matter that *would* be dispositive, the warranty must become part of the basis of the bargain between the supplier and the consumer for the Act to apply. 15 U.S.C. § 2301(6).

Having determined that the Magnuson-Moss Act may apply in some situations where a commercial purchaser buys consumer goods for the purpose of leasing these goods to third parties, the Court finds that dismissal for failure to state a claim upon which relief can be granted would be inappropriate at this time. Moreover, determination of many of the questions regarding applicability of the Act in the case at bar will necessitate much factual inquiry. Specifically, the intent of the parties must be further examined, as must be the circumstances surrounding the transaction. Most important, if such an inquiry leads to a finding that warranties otherwise covered by Magnuson-Moss were issued, there will be the further question whether these warranties became a part of the basis of the bargain. Such factual matters, in light of the many controverted facts surrounding them in the instant case, are inappropriate for resolution at this stage of the litigation. Thus, neither dismissal pursuant to Rule 12(b)(6) nor summary judgment under Rule 56(c) is appropriate.

### C. *Jurisdiction*

While jurisdiction is generally a threshold question, addressed by the Court first of all, in this case it appeared sensible to delay ruling on this issue until it could be addressed in the proper context. The defendants contend that Najran has failed to negate defendants' affirmative defense of lack of personal jurisdiction. Lack of such jurisdiction was raised by defendants in their original answer to the plaintiff's complaint, filed with this Court on July 17, 1984; reference to lack of jurisdiction is made in the joint status report of the parties filed on January 10, 1985; and this defense is included in defendants' answer, filed April 18, 1985, to plaintiff's amended complaint. Defendants' contentions on this issue are essentially that, with the exception of FG, they (FE, FHF, and FHNC) do not conduct business within the State of Georgia, and that there are insufficient contacts with the forum state to uphold jurisdiction.

In response, plaintiff asserts, *inter alia,* that the acts of defendant in the litigation before this Court are inconsistent with a defense of lack of personal jurisdiction, and that defendants have, through their affirmative use of the judicial apparatus, waived this defense. Plaintiff's position has merit. *See Reliable Tire Distribs. v. Kelly Springfield Tire Co.,* 623 F.Supp. 153, 155–56 (E.D.Pa.1985) ("There are limits in the extent to which a defendant can actively litigate a case without waiving defenses of personal jurisdiction. ...");  *see also Burton v. Northern Dutchess Hospital,* 106 F.R.D. 477 (S.D.N.Y.1985). However, jurisdiction over the only defendant

affected directly by the Order issued today is also supported on another basis.

■ Absent waiver, "[i]n a diversity action a federal court can assert jurisdiction over a non-resident defendant only to the extent permitted by the long arm statute of the forum." *Southwire Co. v. Trans-World Metals & Co., Ltd.*, 735 F.2d 440, 442 (11th Cir.1984). Section 9–10–91(1) of the Georgia Code allows for the exercise of jurisdiction over a non-resident defendant who transacts business within the State of Georgia. Such jurisdiction on the basis of transacting business exists "if the nonresident has purposefully done some act or consummated some transaction in this state, if the cause of action arises from or is connected with such act or transaction, and if the exercise of jurisdiction ... does not offend traditional fairness and substantial justice." *Davis Metals, Inc. v. Allen*, 230 Ga. 623, 625, 198 S.E.2d 285, 287 (1974). Long arm jurisdiction "will be exercised to the extent permitted by procedural due process." *Warren v. Warren*, 249 Ga. 130, 131, 287 S.E.2d 524, 525 (1982), and the Georgia statute is interpreted liberally, *Goldkist, Inc. v. Baskin-Robbins & Co.*, 623 F.2d 375 (5th Cir.1980).

In *Delta Equities, Inc. v. Larwin Mortgage Investors*, 133 Ga.App. 382, 211 S.E.2d 9 (1974), the Georgia Court of Appeals upheld jurisdiction over a non-resident defendant whose sole contacts with Georgia consisted of two visits to this state for the purposes of contractual negotiation, and a subsequent phone call. The court held: "[T]he negotiations within the confines of this state constituted the required 'minimum contacts' necessary to hold that appellee was 'transacting business' within the intent of Georgia's Long Arm Statute."

Applying the foregoing to the facts in the case at bar, it is apparent that minimum contacts as to defendant FE can easily be discerned by looking to the negotiations held by representatives of Najran and SABIC with representatives of FE/FI at the Douglas, Georgia Fleetwood manufacturing plant on November 19, 1982. Significant negotiations took place on that day, as is indicated by Mr. Potter's letter of December 1, 1982, which includes a list, five pages in length, of topics discussed and negotiated during that meeting. In addition, it is clear that at least one part of the overall contract for 600 mobile homes was "consummated" in Georgia, because at the meeting in question Najran (apparently having satisfied itself for the time being with the adequacy of the production process) delivered, and the FE/FI representatives accepted, a letter of credit in full payment for the one hundred homes to be sold under the second purchase order.

The second of the three requirements for the exercise of transaction-based long arm jurisdiction noted in *Davis Metals, supra*, is that the cause of action must arise "either directly or indirectly out of such transactions." 230 Ga. at 625, 198 S.E.2d at 287–88. The claims asserted in the instant lawsuit arise in substantial part out of alleged breaches of the contract that was the subject of negotiations on that day. As defendants pointed out, in addressing the choice of law issue, "looking to the essence of the Purchase Agreement, it is clear that [FI] was required to manufacture (through affiliated companies) 600 double wide mobile homes. ... [T]he majority of these activities occurred in Georgia, (in excess of two-thirds of the homes were built [here])...." *Defendant's Memo in Opposition* at 13 n. 4. Clearly the cause of action arises, either directly or indirectly, out of FE/FI's transactions in this state.

At issue are not only breach of contract claims, but also alleged defects in the products manufactured in Georgia. Even if such manufacture was not, as defendant FE claims, carried out under the absolute direction of FE/FI, it is clear that benefit was derived to a greater or lesser degree by FE/FI from the manufacture of the products by the Fleetwood subsidiaries in Georgia. Moreover, the presence of its representatives at the plant to negotiate production details at the very least establishes that FE/FI had some input in the managerial decisions made by the Douglas subsidiary in its production methods or standards for the project. This is another

contact that, while not dispositive, may be taken into consideration.

Finally, the exercise of long arm jurisdiction must not offend traditional fairness and substantial justice. "The third prong of the *Davis Metals* test incorporates this constitutional requirement ... As the Georgia courts have recognized, however, affirmative answers to the first two prongs of the *Davis Metals* test frequently ipso facto constitute the type of minimum contacts and purposeful availment [of the privilege of conducting activity within the forum state] required by *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)." *Southwire Co., supra,* 735 F.2d at 445. In the case at bar, as in the case cited, sufficient contacts exist between Georgia, defendants, and the cause of action that maintenance of the suit does not offend traditional notions of fair play and substantial justice.

As a final note, it matters little if defendant FE claims that Mr. Potter and the other two gentlemen from Fleetwood present at the meeting in Douglas represented one of FE's subsidiaries (FI or GSF) and not FE. For as the Court has already determined FI, GSF and FE have acted as mere alter egos of one another, and the transactions of the subsidiary in such a situation are properly attributable to the parent for jurisdictional purposes. *Avanti Group (USA), Ltd. v. Hart, Schaffner & Marx, et al.,* 173 Ga.App. 831, 834, 328 S.E.2d 433 (1985). This is not "bootstrapping"; it is a matter of common sense. Therefore, jurisdiction is proper.

## CONCLUSION

The Court finds no basis in Georgia or federal law on which to base an award of attorneys' fees at this time. The plaintiff's motion for partial summary judgment is *GRANTED IN PART AND DENIED IN PART.* Defendant's motion to dismiss is DENIED.